**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAMUEL B JOHNSON III,

        Plaintiff,

  v.

CHEVRON CORPORATION, *et al.*,

        Defendants.

_____/

No. C 07-5756 SI

**ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT
and DENYING PLAINTIFF'S MOTION
FOR SUMMARY JUDGMENT AND TO
STRIKE DEFENDANTS' AFFIRMATIVE
DEFENSES**

On April 17, 2009, the Court heard argument on defendants' motion for summary judgment or,

in the alternative, summary adjudication and on plaintiff's motion for summary judgment and to strike

defendants' affirmative defenses. For the reasons stated below, the Court GRANTS defendants' motion

and DENIES plaintiff's motion as moot.

**BACKGROUND**

This case arises out of plaintiff Samuel Johnson III's termination from his job as a Procurement

Specialist for defendant Chevron Environmental Management Company ("CEMC") on August 7, 2006.

Plaintiff was hired by CEMC on August 15, 2005 and worked there until he was terminated nearly a

year later for "[c]ontinued refusal to comply with supervisor instructions, insubordination." Decl. of

Catherine Drew ("Drew Decl."), Docket No. 296, Ex. C. After being terminated, plaintiff filed this

action against CEMC, as well as Chevron Corporation, Chevron Corporation Long Term Disability

Plan, Susan Solger, Sellers (Fee) Stough, Debbie Wong, Catherine Drew, Kathryn Gallacher, Harald

Smedal, Robert Schmitt, Gary Yamashita, and Krystal Tran (collectively, "defendants"), alleging race

and disability discrimination, retaliation, harassment, hostile work environment and wrongful

termination.

Mr. Johnson bases this lawsuit on a number of events which occurred while he was at CEMC. All will be described, in roughly chronological order; wherever there is a dispute between the parties as to an underlying fact, it is noted.

The first event occurred shortly after plaintiff began working for CEMC. According to plaintiff, he got into an argument with Robert Schmitt, one of his coworkers, during a business trip to Atlanta in September 2005. During that argument, plaintiff touched Schmitt, and Schmitt used an expletive when telling plaintiff never to touch him again. Schmitt denies that he ever used profanity. Decl. of Robert Schmitt ("Schmitt Decl."), Docket No. 299, ¶ 12. Plaintiff informed Debbie Wong, his immediate supervisor, about the incident, and they decided that plaintiff would speak with Schmitt to resolve their conflict and would let Wong know if he had any lingering concerns after doing so. Decl. of Debbie Wong ("Wong Decl."), Docket No. 298, ¶¶ 7-8.

On October 20, 2005, plaintiff sent an email to Wong requesting a waiver of a rule that prevented him from applying for another position within 18 months of his starting date. Plaintiff wanted to apply for the position of Supervisor, Contracts Administration. Having not received a reply from Wong, plaintiff emailed Catherine Drew and Nora Rodriguez, both human resources employees, asking to post for the position. In that email, plaintiff explained that he sought waiver of the 18-month rule from Wong, and then from her supervisor, Harald Smedal. Decl. of Samuel Bernard Johnson in Opp. to Defs.' Mot. For Summary Judgment ("Johnson Opp. Decl."), Docket No. 324, ¶¶ 3-5, Exs. 2, 4.

In mid-January of 2006, plaintiff began to revise master contracts templates. He sent an email to his coworkers advising them not to use the templates until the updates were approved by the legal department. Decl. of Susan Solger ("Solger Decl."), Docket Nos. 292-94, Ex. D. In a string of emails that followed, his coworkers expressed confusion as to which templates he was revising, what changes he was making and what they should use while the revised templates awaited approval. *Id.* Plaintiff responded, "Use the current templates. Do not use the revised ones. If you have additional questions, please contact me via telephone." *Id.* When Shar'ron Smith, another coworker, wrote an email to plaintiff requesting further clarification, plaintiff replied, "Shar'ron, since you feel the need not to communicate this matter with me via telephone I will 'reply all' to address your recent statements on

2

this matter in 'blue'.  Please see below."  Johnson Opp. Decl., Ex. 10.  Plaintiff sent this email to everyone in his working group, including Wong, his immediate supervisor, and Smedal, Wong's supervisor.  *Id.*  Smedal replied, asking that the correspondences be toned down and that they all maintain open lines of dialogue.  Decl. of Harald Smedal ("Smedal Decl."), Docket No. 300, Ex. B.

On February 1, 2006, Susan Solger replaced Wong as plaintiff's immediate supervisor.  Prior to taking the position, Solger says she called each of her future employees to try to build morale in anticipation of her starting date.  Solger Decl. ¶ 3, Ex. A.  During this introductory call, plaintiff said that all of his coworkers needed to be fired and that he believed his work was being sabotaged.  *Id.*

Shortly after Solger started, plaintiff asked her for an enhanced vacation accrual rate and a Blackberry PDA.  Solger Decl. ¶ 4, Ex. B.  Plaintiff had previously made both requests to Wong.  *Id.*; Wong Decl. ¶ 11.  In response to these previous requests, Drew had emailed plaintiff to explain that he was not eligible for enhanced vacation.  Solger Decl. ¶ 4, Ex. B.  Plaintiff sent a follow-up email to Smedal, copying Solger, explaining that he felt he was entitled to enhanced vacation based on his experience.  *Id.*, Ex. C.  Additionally, plaintiff continued to request a PDA until at least June 1, 2006.  Johnson Opp. Decl. ¶ 30, Ex. 29.

On March 30, 2006, plaintiff had an Opening 2006 Performance Management Process Meeting with Solger.  Plaintiff recounts that, during that meeting, Solger yelled and screamed at him and said that plaintiff was the cause of everything wrong in CEMC's Business Services Contracts Administration. At that point, plaintiff claims he attempted to refute Solger's assertion, and told her that it was not his fault that minorities viewed Solger as having problems with them.  Johnson Opp. Decl. ¶ 20.  Plaintiff alleges that Solger then began yelling and screaming at him, and that when he attempted to leave the conference room, Solger blocked his path and prevented him from leaving.  *Id.*  Then, plaintiff sat down and began to cry.  *Id.*  Solger claims that she never blocked plaintiff's path or prevented him from leaving.  Solger Decl. ¶ 35.

On April 6, 2006, Wong sent plaintiff his 2005 Performance Management Process, asking him to add his comments, sign it, and return it to her.  Johnson Opp. Decl. ¶ 21, Ex. 19.  Plaintiff added his comments and signed it the same day.  Wong Decl., Ex. E.  His performance review rated him "2," or "fully meets expectations."  Johnson Opp. Decl., Ex. 19; Wong Decl., Ex. E.  Both Wong and Smedal

3

have filed declarations asserting that because plaintiff was relatively new, he likely should have been rated "too new to rate" instead of "fully meets expectations." Wong Decl. ¶ 16; Smedal Decl. ¶ 4. Both contend that plaintiff was given this rating in part to give him incentive to correct performance deficiencies and to perform well in the future. *Id.*

Between May 19, 2006 and May 24, 2006, plaintiff had another dispute with Solger over his work. At that time, plaintiff and Solger corresponded about when to apply a two percent increase to a supplier contract. Johnson Opp. Decl., Ex. 25. Plaintiff explained that he had understood that the increase would be effective June 1, 2006. Solger replied that she consulted with Wong, and that they both felt that May 1, 2006 should be the effective date for the increase. In response, plaintiff sent an email to Smedal that said "Why Can't Debbie [Wong] stay out of Contracts." Johnson Opp. Decl. ¶ 26; Smedal Decl., Ex. C. Smedal forwarded the email to Solger, asking her what Johnson meant. Smedal Decl., Ex. C.

On June 7, 2006, plaintiff claims that Solger yelled at him  a second time during a meeting in her office, and that Solger again attempted to prevent plaintiff from leaving. This time, plaintiff says he was able to squeeze by Solger and leave the office. Johnson Opp. Decl. ¶ 38. Afterward, plaintiff called Nora Rodriguez, a Human Resources Selection Counselor in Houston, Texas, to report that he believed Solger was discriminating and retaliating against him. *Id.* ¶ 39. Rodriguez told plaintiff that she was not the proper person to report those matters to, and referred him to Robert Stevens, an Employee Relations Counselor in Houston, Texas. *Id.* When plaintiff phoned Stevens, he was referred back to his local management. *Id.* ¶ 41. Then, plaintiff phoned Thomas Wyne, a local Human Resources Business Partner. *Id.* ¶ 42. At that time, plaintiff informed Wyne that he did not want to attend a "Performance Update" meeting scheduled with Solger the following day, because of the previous instances of her yelling at him.

Plaintiff also indicates that he reported the yelling incident with Solger to Gary Yamashita, an ombudsman for Chevron Corporation. At some point, Yamashita met with both plaintiff and Solger. Decl. of Gary Yamashita ("Yamashita Decl."), Docket No. 301, ¶ 4. During that meeting, Yamashita reports that Solger was calm and appeared to want to resolve the issues between her and plaintiff. *Id.* ¶ 5. Plaintiff, on the other hand, appeared unwilling to resolve the dispute and was combative and

4

antagonistic. *Id.* ¶¶ 6-7. Yamashita sensed that the source of plaintiff and Solger's problems was simply a personality conflict or disagreement resulting from plaintiff not following Solger's work directions. *Id.* ¶ 8.

Shortly after this incident, plaintiff met with Sellers Stough to discuss Solger's yelling at him, as well as his feeling that his coworkers resented him because he had been hired for a position that Shar'ron Smith was interested in.[1]  Johnson Opp. Decl. ¶ 55; Pl.'s Statement of Undisputed Facts, Docket No. 312, ¶¶ 6-9.  Decl. Of Sellers Stough ("Stough Decl."), Docket No. 291, ¶¶ 4-5.  After that discussion, Stough determined that Solger had raised her voice with plaintiff on one occasion, and Stough met with her to instruct her not to raise her voice with employees. Stough Decl. ¶¶ 4, 6.  Stough did not find any evidence of resentment toward plaintiff, however. *Id.* ¶ 5.  On June 23, 2006, Stough had a follow-up meeting with plaintiff to explain the results of his investigations.  *Id.* ¶ 6.  Stough also sent an email to Drew detailing the initial meeting, his follow-up investigation, and the subsequent meeting with plaintiff.  *Id.*, Ex. B.

While Stough was conducting his investigation, Solger began preparing a Performance Improvement Plan for plaintiff.[2]  Solger Decl. ¶ 18.  The plan identified various areas where Solger felt plaintiff needed to improve, including communication skills, following established work processes, and improving the accuracy and quality of work, as well as his working relationship with customers and coworkers.  Solger Decl. ¶ 18, Ex. N.  Solger circulated the report to Drew, Stough, and Yamashita for feedback.  *Id.*  In her email, Solger explained that relations among the group had been strained since she began in February, but that only Wandie and Bob – two of plaintiff's coworkers – had made progress, while plaintiff had refused to meet them halfway.  *Id.*  It is unclear whether Solger ever discussed the performance improvement plan with plaintiff.

Solger met with plaintiff on June 15, 2006 to discuss contracts files and work processes with which plaintiff had previously had problems complying.  Solger Decl. ¶ 20.  For example, plaintiff had

---

[1]Stough replaced Smedal as Solger's supervisor when Smedal retired on May 31, 2006.  Smedal Decl. ¶ 1; Stough Decl. ¶ 1.

[2]Solger says that she drafted the plan prior to plaintiff making any complaint; however, she sent the plan out to Drew, Stough, and Yamashita the same day that plaintiff met with and complained to Stough.  Solger Decl., Ex. N.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1  been including extraneous papers such as envelopes, fax cover sheets, and redundant copies in the

2  contracts files. Solger Decl. ¶ 11. During this meeting, Solger claims that plaintiff began to argue with

3  her about whether he was making errors, and she left the room to go to retrieve a file to demonstrate the

4  issues she was trying to convey to plaintiff. Solger Decl. ¶ 20. When she returned, Solger said she

5  found plaintiff going through her briefcase. *Id.* Plaintiff contends that this accusation is false. Johnson

6  Opp. Decl. ¶ 62; Pl.'s Opp. at 22.

7       Over the next few weeks, Solger continued to note problems with plaintiff's work habits. For

8  example, on June 20, 2006, Solger emailed plaintiff with a list of changes he had failed to make when

9  drafting a Service Order. Solger Decl. ¶ 21, Ex. P. The following day, Solger corresponded with

10  plaintiff again, this time regarding the lack of timeliness of his work. *Id.* ¶ 22, Ex. Q. On July 4, Solger

11  wrote to plaintiff regarding a client complaint about the lack of timeliness of his work. *Id.* ¶ 23, Ex. R.

12  This time, it had taken plaintiff more than three weeks to complete a service order for a requisition form

13  he had received on June 13, 2006. *Id.* Finally, Solger also reports that plaintiff once stuck his tongue

14  out at her and once sat through a meeting with his hand resting on his face and his middle finger

15  extended. Solger Decl. ¶ 35. Plaintiff does not dispute that any of these exchanges regarding his work

16  took place; rather, he asserts that Solger was simply placing hurdles in front of him to make it harder

17  for him to complete his work. Pl.'s Opp. at 18, 21. Additionally, plaintiff asserts that he never stuck

18  his tongue out at Solger and never made an obscene gesture at her. Johnson Opp. Decl. ¶ 63; Pl.'s Opp.

19  at 10.

20       On July 12, 2006, at the request of Drew, Kathryn Gallacher commenced an investigation into

21  plaintiff's complaints regarding Solger. Drew Decl. ¶ 3; Gallacher Decl. ¶ 5. Plaintiff left a phone

22  message and emailed Gallacher a summary of his complaint that same day. Decl. of Kathryn Gallacher

23  ("Gallacher Decl."), Docket No. 297, ¶ 5, Ex. A; Pl.'s Statement of Undisputed Facts ¶¶ 13-17. Plaintiff

24  indicated that Solger had "yelled at [him] on three (3) separate occasions," had "tried to intimidate

25  [him]," had "placed [him] in a hostile work environment," had "provided false information to HR

26  regarding a past HR issue," and had "stood over [plaintiff's] desk and stared [plaintiff] down and

27  demanded that [he] repeat word for word the statements that came out of her mouth." Gallacher Decl.

28  ¶ 5, Ex. A  Plaintiff explained that he could "go on and on about this matter." *Id.* He also noted that

6

1   he had familiarity with filing EEOC charges, and that he was ready to file an EEOC charge in this case.

2   *Id.*

3       Gallacher reports that during her investigation, she interviewed approximately ten people

4   regarding plaintiff's allegations, including Wong, Solger, Stough, Yamashita, and plaintiff's coworkers,

5   and took approximately 70 pages of handwritten notes. *Id.* ¶ 7. Additionally, Gallacher received

6   between 30 and 40 emails from plaintiff, as well as some emails from Solger. *Id.*; *see also* Johnson Opp.

7   Decl. ¶¶ 72-74, 82-83, Exs. 64-66, 76-77. Some of the emails plaintiff sent to Gallacher demonstrated

8   that he did not intend to comply with his supervisor's work requests. Gallacher Decl. ¶ 14. For

9   example, on one occasion, plaintiff refused to comply with one of Solger's requests by email, and then

10  forwarded the email exchange to Gallacher, stating, "See below. She is now ordering me to do things."

11  *Id.* ¶ 14, Ex. B; Johnson Opp. Decl. ¶ 74, Ex. 66. Gallacher also reports that plaintiff left her a

12  voicemail that same day, indicating he had no intention to comply with Solger's request. Gallacher

13  Decl. ¶ 19.

14      Gallacher completed her investigation on July 26, 2006 and prepared a summary of her findings.

15  *Id.* ¶¶ 15-20, Ex. C. Gallacher found no evidence during her investigation to corroborate any of

16  plaintiff's allegations. *Id.* She concluded that Solger's story was credible and substantiated by

17  documentation and the accounts of others, while plaintiff's statements were often false or exaggerated.

18  *Id.* Gallacher did not hear complaints about Solger from any other employee or supervisor during her

19  interviews, nor did she find information suggesting that Solger had harassed, discriminated or retaliated

20  against anybody. *Id.* Moreover, Gallacher indicates that she confirmed that plaintiff provided untruthful

21  information regarding multiple issues during her investigation. *Id.* Drew and Stough met with plaintiff

22  and Solger separately to convey the findings of Gallacher's investigation. Drew Decl. ¶¶ 9-10. When

23  they met with plaintiff, they encouraged him to move forward, follow Solger's work-related instructions,

24  and improve his performance. *Id.* ¶ 10. Plaintiff does not dispute that Gallacher's investigation

25  concluded his allegations were unfounded, but he maintains that all the allegations themselves are true.

26  Johnson Opp. Decl. ¶ 99.

27      On July 18, 2006, plaintiff was suspended from work with pay. One day earlier, plaintiff sent

28  an email to Solger requesting that she release two service orders. Solger Decl. ¶ 24, Ex. S. Solger

**United States District Court**
For the Northern District of California

7

**United States District Court**
For the Northern District of California

replied, explaining to plaintiff that the process was to turn in the associated paperwork before she released the orders. *Id.* Plaintiff then replied the following morning, saying that the process had never been that he turn in paperwork after the supervisor had already reviewed it once. *Id.* Plaintiff said that Solger had already reviewed the paperwork. *Id.* Solger replied to plaintiff and explained that the process she had established requires all requests for release of funds to include the associated paperwork. *Id.* Plaintiff, rather than providing the associated paperwork to Solger, replied to her email again, saying, "This is the first time that you are informing me of this revised process. You have previously released change orders under the old process."[3] *Id.*; Johnson Opp. Decl. ¶ 69, Ex. 61. Then, Solger emailed plaintiff, indicating that the process was not new and that she did not understand why plaintiff was resisting her request for documentation. Solger Decl. ¶ 24, Ex. S. She ordered plaintiff to provide the paperwork by the end of the day. *Id.* Plaintiff replied, "Please stop sending me these types of emails." *Id.*

At this point, Solger forwarded the email exchange to both Stough and Drew. *Id.* Stough discussed the exchange with Drew, and made the decision to suspend plaintiff for one day with pay. Stough Decl. ¶ 10. While plaintiff was suspended, Drew drafted a Record of Discussion explaining why plaintiff was suspended and how his behavior must change. Drew Decl. ¶ 5, Ex. A. Then, on July 19, 2006, Drew called plaintiff back to work and met with him, Solger, and Stough to discuss plaintiff's behavior and how he needed to improve it. *Id.* ¶¶ 5-6. Drew also sent her notes from that meeting, which indicated that plaintiff was agitated during the conversation, to Stough and Solger. *Id.* ¶ 6, Ex. B.

According to defendants, plaintiff's performance did not improve after this meeting. Rather, plaintiff apparently refused to comply with Solger's work orders on three separate occasions. First, according to Solger, plaintiff kept pending files in his locked office on two occasions during the last week of July, despite being instructed to keep them in the file room so that others could access them. Solger Decl. ¶ 32, Ex. AA. Moreover, Solger indicates that plaintiff disputed his need to follow this process. *Id.* Plaintiff, however, asserts that he never locked his office door. Johnson Opp. Decl. ¶ 94.

---

[3]Plaintiff also cites some instances in which Solger released orders without the associated paperwork. *See, e.g.*, Johnson Opp. Decl. ¶¶ 61, 67.

United States District Court
For the Northern District of California

Second, in response to plaintiff's email explaining that he was on a work reduction schedule due to a repetitive stress injury, Solger requested a list of contacts and attorneys that he had worked with in relation to assignments she had instructed him to suspend work on. *Id.* ¶ 32, Ex. BB. Solger initially made this request by email on July 12, 2006. *Id.* On August 7, 2006, Solger emailed plaintiff again, indicating that she had yet to receive a list of names. *Id.* Plaintiff disputes that he failed to provide Solger the names of the contacts: he emailed Solger with the relevant names and also claims that he provided the information to Solger in a memo dated February 2, 2006. Johnson Opp. Decl. ¶¶ 100-102, Ex. 91. Solger contends that the February memo did not contain the information she requested. Solger Decl. ¶ 32.

Finally, on August 7, 2006, Solger sent a request to schedule a performance review meeting, which all employees are required to attend, with plaintiff and Drew. *Id.* ¶ 32, Ex. CC. Plaintiff replied by email, indicating that he would be unavailable. *Id.* When Solger asked why, he replied that he would be at the gym and could not meet at that time. *Id.* Plaintiff does not dispute that he sent this email to Solger; rather, he argues that Drew was aware that plaintiff typically went to the gym as part of a stress management plan.[4] Johnson Opp. Decl. ¶ 97.

Based on these three interactions, Drew and Stough decided that plaintiff's continued disregard of instructions, as well as his continued poor performance, warranted his termination. Drew Decl. ¶ 12; Stough Decl. ¶ 17. A Record of Discussion was created, noting that plaintiff was being terminated for "continued refusal to comply with supervisor instructions, insubordination," as well as that plaintiff's work performance and job knowledge fell below expectations. Drew Decl. ¶ 14, Ex. C; Stough Decl ¶ 19. Then, Drew, Stough and Solger met with plaintiff to inform him that his employment was being terminated. Drew Decl. ¶ 15; Stough Decl. ¶ 20. Drew reports that she requested security to be present outside the office where the meeting was held, due to her previous observations that plaintiff's behavior was unpredictable, and that plaintiff was surprisingly calm during the meeting. Drew Decl. ¶¶ 15-16.

After his termination, plaintiff obtained an EEOC right to sue letter and filed this action. In the

---

[4]In the previous paragraph of his declaration, plaintiff also asserts that Solger had prior knowledge that he was to attend a training seminar at that time. Johnson Opp. Decl. ¶ 96. It is unclear why plaintiff, on the one hand, claims he was going to the gym, and on the other, claims that he had a training seminar.

United States District Court
For the Northern District of California

operative complaint (plaintiff's Second Amended Complaint ("SAC"), Docket No. 263), plaintiff alleges violations of 42 U.S.C. § 1981, Title VII of the 1964 Civil Rights Act (42 U.S.C § 2000e-2(a)) ("Title VII") , and the California Fair Employment and Housing Act ("FEHA") (Cal. Gov. Code §§ 12900 *et seq.*), for discrimination and retaliation, including wrongful termination, failure to prevent discrimination and retaliation, unfair treatment, and failure to train, and for harassment, including hostile work environment and emotional distress.  Plaintiff also alleges violations of the Americans with Disabilities Act ("ADA") (42 U.S.C. § 12101 *et seq.*) and FEHA for disability discrimination, including failure to engage in the interactive process.[5]  Defendants answered the SAC and now move for summary judgment, or in the alternative, summary adjudication.  Plaintiff, conversely, has moved for summary judgment on each of defendants' twenty-one affirmative defenses, or in the alternative, to strike each of those defenses.  Both motions are before the Court.

## LEGAL STANDARD

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The moving party, however, has no burden to negate or disprove matters on which the non-moving party will have the burden of proof at trial.  The moving party need only demonstrate to the Court that there is an absence of evidence to support the non-moving party's case.  *See id.* at 325.

The burden then shifts to the non-moving party to "designate 'specific facts showing that there is a genuine issue for trial.'"  *Id.* at 324 (quoting Fed. R. Civ. P. 56(e)).  To carry this burden, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  "The mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the jury

---

[5]The Court has previously limited plaintiff's disability discrimination claims to his HIV/AIDS status.  *See, e.g.*, Docket Nos. 114, 118, 132, 173, 241, 261, 263, 268.

could reasonably find for the [non-moving party]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

In deciding a summary judgment motion, the evidence is viewed in the light most favorable to the non-moving party, and all justifiable inferences are to be drawn in its favor. *Id.* at 255. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge [when she] is ruling on a motion for summary judgment." *Id.* Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment. *Thornhill Publ'g Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir.1979); *see also Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002) (observing that there is no genuine issue of fact "where the only evidence presented is 'uncorroborated and self-serving' testimony" (quoting *Kennedy v. Applause, Inc.*, 90 F.3d 1477, 1481 (9th Cir. 1996))). The evidence presented by the parties must be admissible. Fed. R. Civ. P. 56(e). Hearsay statements found in affidavits are inadmissible. *Fong v. Am. Airlines, Inc.*, 626 F.2d 759, 762-63 (9th Cir. 1980).

# DISCUSSION

## I.    Discrimination and Retaliation

Under FEHA, courts employ the same burden shifting framework that is used to evaluate claims of retaliation and disparate treatment under Title VII. *See Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981) (disparate treatment under Title VII); *Guz v. Bechtel Nat'l, Inc.*, 24 Cal.4th 317, 354 (2000) (disparate treatment under FEHA); *Villiarimo*, 281 F.3d at 1064 (retaliation under Title VII); *Yanowitz v. L'Oreal USA, Inc.*, 36 Cal.4th 1028, 1042 (2005) (retaliation under FEHA). The burden-shifting method of proof set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-805 (1973), governs plaintiff's claims of discrimination under Title VII and FEHA. Once a plaintiff establishes a prima facie case of discrimination, the employer must offer a legitimate, nondiscriminatory reason for the adverse employment decision. *See Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 142 (2000); *Collings v. Longview Fibre Co.*, 63 F.3d 828, 833-34 (9th Cir. 1995); *Smith v. Barton*, 914 F.2d 1330, 1340 (9th Cir. 1990). If the employer meets this burden, the plaintiff may produce either direct evidence of discriminatory motive, which need not be substantial, or circumstantial

11

evidence that is "specific and substantial" evidence of pretext.  *See Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1221-22 (9th Cir. 1998).

Similarly, the analysis for claims under Title VII and § 1981 overlap.  *See Gay v. Waiters' & Dairy Lunchmen's Union, Local No. 30*, 694 F.2d 531, 537 (9th Cir. 1982).  Title VII is an "ambitious, prophylactic measure," which was designed "to bar not only overt employment discrimination, 'but also practices that are fair in form, but discriminatory in operation.'"  *Id.* (quoting *Griggs v. Duke Power Co.*, 401 U.S. 424, 431 (1971)).  Section 1981, on the other hand, requires proof of intentional discrimination.  *Id.*  Thus, the same burden-shifting framework applies to intentional discrimination under both statutes, but disparate impact must be analyzed separately under Title VII.

## A.  Retaliation

Fundamentally, plaintiff's claim under Title VII, § 1981, and FEHA is that defendants discriminated and retaliated against him for complaining that he believed he was being discriminated against.  Plaintiff focuses on two adverse employment actions – his suspension from work on July 18, 2006, and his termination on August 7, 2006 – arguing that each occurred in retaliation for his previous complaints.  Defendants contend that plaintiff was suspended, and later terminated, due to repeated acts of insubordination.

To establish a prima facie case for retaliation, a plaintiff must show that: (1) he engaged in protected activity; (2) his employer subjected him to an adverse employment action; and (3) there is a causal link between the protected activity and the adverse action.  *See Ray v. Henderson*, 217 F.3d 1234, 1240 (9th Cir. 2000).  While in some cases, causation can be inferred from timing where an adverse employment action follows a protected activity, in order to sustain an inference of retaliatory motive, the adverse action must have occurred "fairly soon" after the protected activity.  *Villiarimo*, 281 F.3d at 1065.

Plaintiff has established a prima facie case for retaliation.  Both plaintiff's suspension and termination constitute adverse employment actions.  *See Davis v. Team Elec. Co.*, 520 F.3d 1080, 1089 (9th Cir. 2008) ("[A]n adverse employment action is one that materially affects the compensation, terms, conditions, or privileges of employment.") (internal quotations and citations omitted).  Additionally,

United States District Court

For the Northern District of California

plaintiff engaged in protected activity on June 7, 2006 when he called to complain about Solger yelling at him, alleging that she had discriminated against him, and again on July 12, 2006 when he participated in Gallacher's investigation into his discrimination claims. Plaintiff was suspended on July 18, 2006, a mere six days after he engaged in protected activity. Six days is sufficiently close to suggest a discriminatory motive may be present. *See, e.g.*, *Miller v. Fairchild Indus., Inc.*, 885 F.2d 498, 505 (9th Cir. 1989) (finding prima facie case for causation where discharges occurred forty-two and fifty-nine days after the plaintiffs engaged in protected activities).

After plaintiff has established a prima facie case, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for each adverse employment action in order to rebut the inference of causation. *See Reeves*, 530 U.S. at 142. The employer's reason does not need to be true in fact; rather, "courts only require that an employer honestly believed its reason for its actions, even if its reason is foolish or trivial or even baseless." *Villiarimo*, 281 F.3d at 1063 (citations and internal quotation marks omitted). Here, defendants assert that their legitimate, non-discriminatory reason for the adverse employment actions was plaintiff's repeated acts of insubordination. *See Aldrup v. Caldera*, 274 F.3d 282, 286 (5th Cir. 2001) ("The failure of a subordinate to follow a direct order of a supervisor is a legitimate nondiscriminatory reason for taking adverse employment action."). Defendants provide evidence of four actions by plaintiff that they believe constituted insubordination: (1) plaintiff's email dated July 17, 2006, sent in response to Solger's work directive, saying, "Please stop sending me these types of emails"; (2) plaintiff keeping contracts files locked in his office, despite being instructed not to; (3) plaintiff failing to provide a list of contacts to Solger after she requested it; and (4) plaintiff refusing to attend his performance update meeting because he would be "at the gym." These instances are sufficient for defendants to meet their burden.

The burden then shifts back to plaintiff to produce evidence showing that the reason proffered by defendants was not its true reason, but pretext for discrimination. *See Reeves*, 530 U.S. at 143. Plaintiff must provide either direct evidence of a discriminatory motive or "specific and substantial evidence" that defendants' proffered reasons for its conduct are not reliable. *See Godwin*, 150 F.3d at 1221-22. In other words, plaintiff must show that the reasons articulated by defendants are either false or set forth to conceal a discriminatory motive. Here, plaintiff focuses on the temporal proximity of the

1    adverse employment actions to his complaints, and argues that the reasons offered by defendants are

2    false.  Plaintiff fails to demonstrate discriminatory motive on either account.

3            First, plaintiff attempts to show pretext by relying on the fact that each adverse employment

4    action occurred after he complained of discriminatory treatment.  *See* Pl.'s Opp. at 2-5, 7-11, 20-21, 23-

5    27.  While temporal proximity may establish a plaintiff's prima facie case, it is not "specific and

6    substantial" evidence of pretext.  *See Godwin*, 150 F.3d at 1221-22.  That is, to meet his burden, plaintiff

7    must offer evidence beyond the mere fact that the adverse employment action occurred after his

8    complaints to demonstrate that the reasons offered by defendants were mere pretext.  The only evidence

9    plaintiff cites are his own inferences of discriminatory motive, contained in his declarations, and the

10   declarations of coworkers that restate complaints plaintiff made to them.  *See* Decl. of Samuel Bernard

11   Johnson III in Support of Pl.'s Reply to Defs.' Opp. to Pl.'s Mot. for Summary Judgment ("Johnson

12   Reply Decl."), Docket No. 336, Ex. 2 (Decl. of Veronica Jones), Ex. 4 (Decl. of Corinne Hernandez),

13   Ex. 12 (Decl. of Joyce Tate), Ex. 14 (Decl. of Shar'ron Smith).  Most of the statements in the coworkers'

14   declarations are inadmissible hearsay because they consist of the coworkers' accounts of what plaintiff

15   told them other people said or did to plaintiff.[6]  In a few instances, the coworkers attest to their own

16   observations of unprofessional conduct by Solger and Wong, but in each such case, the conduct is

17   directed toward the declarant, not plaintiff.  *See, e.g.*, Decl. of Corinne Hernandez ¶ 4 (accusing Solger

18   of shoving her in the hallway); Decl. of Shar'ron Smith ¶¶ 4-6 (describing interview process and

19   accusing Wong of being unprofessional in how she informed Smith of the decision not to hire him).

20   These accusations therefore have little or no bearing on plaintiff's claims, and do not suggest that the

21   reasons given for his suspension and termination – insubordination – were pretext.  Plaintiff's

22   uncorroborated accusations in his declaration are not sufficient to raise a genuine issue of material fact

23   as to defendants' motive.  *See Villiarimo*, 281 F.3d at 1061; *see also FTC v. Stefanchik*, 559 F.3d 924,

24

25           [6]Declarations or affidavits may generally be used in connection with the summary judgment
     process; see Fed. R. Civ. Pro. 56.  However,  such declarations must "set out facts that would be
26   admissible in evidence."  Fed. R. Civ. Pro. 56(e)(1).  The problem here is that *plaintiff's statements* to
     the co-worker declarants are inadmissible hearsay. Fed. R. Evid. 801.  Plaintiff argues that the hearsay
27   statements in the witness declarations he submits fall under the "unavailable declarant" exception under
     Rule 804.  *See* Pl.'s Reply to Defs.' Amended Objections to Pl.'s Evidence, Docket No. 346, at 12-14,
28   20-155.  However, this misses the point:  it is the hearsay contained *in* the co-worker declarations which
     is inadmissible; their availability or unavailability is simply not relevant to that question.

929 (9th Cir. 2009) ("A non-movant's bald assertions or a mere scintilla of evidence in his favor are both insufficient to withstand summary judgment."). Plaintiff does not cite a single email, statement, piece of testimony, or other admissible evidence that shows defendants were motivated by retaliatory intent.[7]

Second, plaintiff disputes two of the reasons defendants cite to support their assertion that plaintiff was insubordinate. Specifically, plaintiff argues that he never locked his office door and that he provided the requested list of contacts to Solger.[8] *See* Johnson Opp. Decl. ¶¶ 94, 100-102, Ex. 91. As the Court must draw all reasonable inferences in favor of plaintiff, the non-moving party, the Court will assume that plaintiff's version is accurate. Plaintiff does not dispute that he sent at least two of the emails that defendants cite as reasons for terminating plaintiff – the message asking Solger to stop sending him emails and the email saying he would not attend his performance review meeting because he would be at the gym. Plaintiff's justifications for sending these emails, *id.* ¶¶ 61, 97, do not create a factual dispute on the issue of pretext. It is not in the province of this Court to evaluate defendants' belief; rather, plaintiff must provide some evidence that defendants lied. *See Villiarimo*, 281 F.3d at 1065; *see also Johnson v. Nordstrom, Inc.*, 260 F.3d 727, 732 (7th Cir. 2001) ("To demonstrate pretext, a plaintiff must show more than that the employer's decision was incorrect; the plaintiff must also show the employer lied about its proffered explanation.") (citation omitted). Again, the only evidence plaintiff provides are his own inferences and the unrelated complaints of his coworkers. For the reasons outlined above, neither is sufficient to raise a genuine issue of material fact as to whether the reasons offered by defendants were pretext for discrimination. Accordingly, defendants' motion for summary judgment on this issue is GRANTED.

---

[7]The Ninth Circuit has held that it is not the Court's task to "scour the record in search of a genuine issue of triable fact." *Keenan v. Allan*, 91 F.3d 1275, 1278 (9th Cir. 1986). The Court "need not examine the entire file for evidence establishing a genuine issue of fact, where the evidence is not set forth in the opposition papers *with adequate references* so that it could be conveniently found." *Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1031 (9th Cir. 2001).

[8]Plaintiff also disputes other allegations made by defendants, including whether he went through Solger's briefcase and whether he sat through a meeting with his hand on his face, middle finger extended. Pl.'s Opp. at 10, 22; Johnson Opp. Decl. ¶¶ 62-63. However, defendants do not rely on these events as reasons for plaintiff's suspension and termination, so whether they happened is not a material issue of fact.

1

2          **B.      Disparate treatment**

3          Plaintiff also alleges that he was discriminated against throughout the course of his employment,

4   for instance when Solger leaned over his desk and yelled at him, and when she forced him to comply

5   with work processes.  This allegation is essentially a disparate treatment claim under Title VII.

6          To establish a prima facie case for disparate treatment, a plaintiff must show that: (1) he is a

7   member of a protected class; (2) he was qualified for the position he sought or was performing

8   competently in the position he held; (3) he suffered an adverse employment action, such as termination,

9   demotion, or denial of an available job; and (4) similarly situated employees not in his protected class

10  were treated more favorably.  *See Villiarimo*, 281 F.3d at 1062.

11         The three instances in which Solger purportedly yelled at plaintiff and her requests that he

12  comply with work processes do not rise to the level of adverse employment actions because these acts

13  did not materially alter plaintiff's employment.  *See Davis*, 520 F.3d at 1089 ("[A]n adverse

14  employment action is one that materially affects the compensation, terms, conditions, or privileges of

15  employment.") (internal quotations and citations omitted).  In any event, plaintiff has not provided

16  evidence demonstrating that similarly situated employees not in his protected class were treated more

17  favorably.  Plaintiff argues that Solger began enforcing work processes that he previously did not have

18  to follow, in an effort to place barriers in front of him and to prevent him from completing his work.

19  Pl.'s Opp. at 21.  However, plaintiff does not provide any evidence that others were not required to

20  follow these processes or that only members of his protected class were required to; instead, he relies

21  on his own allegations that he was treated unfavorably, which are insufficient to survive summary

22  judgment.  *See Villiarimo*, 281 F.3d at 1061; *see also FTC*, 559 F.3d at 929 ("A non-movant's bald

23  assertions or a mere scintilla of evidence in his favor are both insufficient to withstand summary

24  judgment.").  Finally, plaintiff's allegation that he was treated differently than he had been before does

25

26

27

28

16

1   not constitute disparate treatment.[9]   Accordingly, defendants' motion for summary judgment on this

2   issue is GRANTED.

3

4       **C.    Disability discrimination**

5       Plaintiff also claims defendants violated FEHA and the ADA by discriminating against him on

6   the basis of his disability.  The Court has ruled that plaintiff's disability discrimination claims must be

7   limited to his HIV/AIDS status.[10]   Despite the Court's previous orders, plaintiff's arguments continue

8   to focus on the work-related injury claims that are not alleged in the operative complaint.  The Court

9   will not consider those arguments here.

10      To establish a prima facie case for disability discrimination, a plaintiff must show that

11  defendants took a tangible, adverse employment action against plaintiff or treated him differently

12  *because of* his disability.  *Community House, Inc. v. City of Boise*, 490 F.3d 1041, 1053 (9th Cir. 2007).

13  Plaintiff's disability discrimination claim based on his HIV/AIDS status fails for a number of reasons.

14  First, plaintiff failed to exhaust administrative remedies available to him before filing his complaint.

15  *See* Cal. Gov. Code § 12960; 42 U.S.C. § 2000e-5(b), (c), (d), (e), (f)(1).  Here, plaintiff's EEOC/DFEH

16  Charge of Discrimination referenced only his work-related injuries, not his HIV/AIDS status.  Isvoranu

17  Decl., Ex. D.  Plaintiff cannot file an EEOC/DFEH Charge of Discrimination based on one type of

18  disability, and then sue based on a different disability.  *See Davis v. Alhambra Nat'l Water Co.*, 1999

19  WL 33435, *1-2 (N.D. Cal. Jan. 20, 1999).

20      In addition, plaintiff cannot establish that his disability was the cause of an adverse employment

21  action without establishing that defendants were aware of his disability.  *Brundage v. Hahn*, 57 Cal.

22  App. 4th 228, 236-37 (1997).  Here, the individual defendants have each asserted in their declarations

23

24          [9]Even if plaintiff argues that he was treated less favorably than each of his coworkers, defendants
25  have articulated a legitimate, non-discriminatory reason, and plaintiff has not offered evidence
    demonstrating that those reasons were pretext for discrimination.  *See* I.A *supra*.

26          [10]The Court previously found that allowing plaintiff to assert claims based on his work-related
27  injury, which he first raised over a year into litigation and shortly before the close of non-expert
    discovery, would force the parties to reopen and extend discovery, further delaying the litigation and
28  unduly prejudicing defendants.  Accordingly, the Court limited plaintiff's disability claims to his
    HIV/AIDS status only.  *See* Docket Nos. 261, 268.

United States District Court
For the Northern District of California

that they had no knowledge of plaintiff's HIV/AIDS status. *See* Defs.' Reply at 7 (citing assertion in each defendant's declaration). Moreover, plaintiff admitted during his deposition that he never disclosed to anyone at his workplace that he had HIV/AIDS. Isvoranu Decl., Ex. B. Plaintiff attempts to show that defendants had knowledge of his HIV/AIDS status by submitting a declaration. Decl. of Samuel Bernard Johnson III Regarding Defs. Having Knowledge that Pl. Has HIV/AIDS ("HIV Decl."), Docket No. 323. Most of that declaration relates to plaintiff's work-related injury claims, however, and does not demonstrate that defendants were aware of his HIV/AIDS status. The only document that mentions his HIV/AIDS status is a letter plaintiff wrote to Krystal Tran on August 4, 2006. HIV Decl., Ex. 5. While that letter suggests plaintiff has HIV/AIDS, it is stamped "received" on August 9, 2006, two days after plaintiff was terminated. *See id.* Additionally, plaintiff argues that defendants had knowledge of his HIV/AIDS status because of an incident in which his bags were detained at an airport because the airline allegedly thought his antiviral drugs were not a prescription and were obtained illegally. Pl.'s Opp. at 13. Plaintiff does not cite to any evidence in support of this allegation, however. Again, plaintiff's bald assertions are not sufficient to withstand summary judgment absent any corroborating evidence. *See FTC*, 559 F.3d at 929. Thus, plaintiff has failed to establish a genuine issue of material fact as to whether defendants had knowledge of his disability. Accordingly, defendants' motion for summary judgment on this issue is GRANTED.[11]

## II.     Harassment and Hostile Work Environment

Plaintiff also alleges that he was subjected to harassment, including emotional distress and a hostile work environment, in violation of Title VII, § 1981, and FEHA. Defendants contend that the alleged conduct was not sufficiently severe or pervasive to state a claim for harassment or a hostile work environment.

---

[11]Plaintiff's claim that defendants failed to engage in the interactive process under California Government Code Section 12940(n) also fails, because it requires that defendants have had knowledge of plaintiff's medical condition. Cal. Gov. Code § 12940(n) ("For an employer or other entity covered by this part to fail to engage in a timely, good faith, interactive process with the employee or applicant to determine effective reasonable accommodations, if any, in response to a request for reasonable accommodation by an employee or applicant with a known physical or mental disability or *known* medical condition.") (emphasis added). As outlined above, plaintiff has failed to demonstrate that defendants had any knowledge of his HIV/AIDS status.

To establish a prima facie case for harassment or a hostile work environment, plaintiff must show that: (1) defendants subjected him to verbal or physical conduct based on his race; (2) the conduct was unwelcome; and (3) the conduct was sufficiently severe or pervasive to alter the conditions of his employment and create an abusive working environment. *Surrell v. Cal. Water Serv. Co.*, 518 F.3d 1097, 1108 (9th Cir. 2008). The work environment must be objectively hostile or abusive, as well as abusive or hostile to the victim's subjective perception. *Harris v. Forklift Sys, Inc.*, 510 U.S. 17, 21-22 (1993); *Fuller v. City of Oakland*, 47 F.3d 1522, 1527 (9th Cir. 1995). Whether an environment is sufficiently hostile or abusive requires consideration of all the circumstances. *Harris*, 510 U.S. at 23. Circumstances to consider include: the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interfere[d] with [plaintiff's] work performance." *Id.* "Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment – an environment that a reasonable person would find hostile or abusive – is [not discriminatory]." *Id.*

Whether or not plaintiff could establish the first three prongs of a hostile work environment claim, the conduct plaintiff alleges he was exposed to is not sufficiently severe or pervasive, as a matter of law, to create a hostile work environment. Plaintiff contends that Solger yelled at him on approximately three occasions, at least one of which made him cry. Additionally, plaintiff describes an incident in which Solger blocked his path and a few instances in which Solger requested work from him or allegedly changed (or began enforcing previously unenforced) work processes to make it harder for him to complete his work. Plaintiff also cites an incident in Atlanta where Schmitt swore at him, and possibly on one other occasion. Even if all of these things happened, the conduct is not sufficiently severe or pervasive to create a hostile work environment.

In *Vasquez v. County of Los Angeles*, 349 F.3d 634 (9th Cir. 2003), the Ninth Circuit found that the plaintiff failed to establish that conduct was severe or pervasive enough to establish a hostile work environment. There, the plaintiff complained that defendants made statements that he had "a typical Hispanic macho attitude" and that he should consider transferring to the field because "Hispanics do good in the field." *Vasquez*, 349 F.3d at 643. Additionally, plaintiff cited two instances where one defendant yelled at him and two false complaints about his work. The court concluded that this conduct,

United States District Court

For the Northern District of California

1  which included two race-related remarks, as well as a few other isolated incidents, was not sufficiently

2  severe or pervasive.  *Id.* at 644.

3      In *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1114-15 (9th Cir. 2004), by contrast, the Ninth

4  Circuit found that the plaintiff established that conduct was severe or pervasive enough to create a

5  hostile work environment.  There, the plaintiff was frequently subjected to racial insults, as well as

6  subtle racial taunts, by both his supervisors and coworkers.  *McGinest*, 360 F.3d at 1115.  He was

7  labeled "stupid" and "sparrow brain" by his supervisor on a number of occasions.  *Id.*  Racist graffiti

8  appeared regularly in the bathroom and on equipment.  *Id.*  Plaintiff was also involved in a serious

9  automobile accident because his supervisor and garage mechanics were unwilling to ensure that his

10 vehicle received necessary maintenance due to his race.  *Id.* at 1114.  Finally, plaintiff's supervisor

11 subjected him to dangerous work conditions and barraged him with insults, including telling him on one

12 occasion that "only drug dealers can afford nice gold chains."  *Id.*  The court found that these instances,

13 when added together, created a hostile work environment.  *Id.* at 1118.

14      Here, the isolated instances of hostility cited by plaintiff are similar to those in *Vasquez* and do

15 not rise to the level of the conduct in *McGinest*.  In fact, the conduct here is less objectionable than that

16 in *Vasquez*, because plaintiff does not contend that anyone ever made a race-related remark to or about

17 him.  Therefore, the conduct here was not severe or pervasive enough to establish a hostile work

18 environment.

19      Moreover, even if the conduct were sufficiently severe or pervasive, plaintiff would fail to

20 establish a prima facie case of harassment or hostile work environment because he fails to offer evidence

21 that any of these incidents occurred *because* of his race.  Plaintiff does not provide any evidence –

22 beyond his own conclusions – that Solger yelled at him or enforced work processes because of his race,

23 nor does he suggest that anyone ever made a race-related comment to him.  Accordingly, defendants'

24 motion for summary judgment on this issue is GRANTED.

25

26 **III.    Plaintiff's Other Claims**

27      Plaintiff alleges that defendants failed to prevent discrimination in violation of § 1981.  The

28 success of plaintiff's "failure to prevent" claim depends on the success of his retaliation and

discrimination claims.  That is, defendants cannot be liable for failure to prevent discrimination if plaintiff has no viable claim for discrimination or retaliation.  Accordingly, defendants' motion for summary judgment on this issue is GRANTED.[12]

Plaintiff also claims that defendants failed to train him in violation of FEHA and § 1981. Defendants provide ample evidence that plaintiff was given both formal and informal, individualized training.  *See, e.g.*, Solger Decl. ¶ 36; Wong Decl., Ex. G.  Plaintiff's claim seems to rely on one instance where Solger discouraged him from attending an eSourcing training session.  Solger contends that the reason she discouraged plaintiff from attending this session is that its subject matter was unrelated to his current position because his group did not use eSourcing tools.  Solger Decl. ¶ 36. Moreover, Solger says that plaintiff was allowed to attend this training.  *Id.*  In any event, even if plaintiff had been forbidden from attending one eSourcing training, this incident would not be sufficient to establish a prima facie case for failure to train.  Accordingly, defendants' motion for summary judgment on this issue is GRANTED.

## IV.    Defendants' Evidentiary Objections

Defendants have filed objections to much of the evidence submitted by plaintiff, including an objection that many of the statements contained in declarations filed by plaintiffs' coworkers constitute inadmissible hearsay.  The Court addressed this objection above.  The Court need not decide the remainder of defendants' objections in light of the disposition of this case.

## V.    Plaintiff's Motion for Summary Judgment

Plaintiff has also moved for summary judgment on defendants' twenty-one affirmative defenses or, in the alternative, to strike each of those defenses.  Some of the affirmative defenses, including that defendants had a legitimate business reason for actions taken against plaintiff and that plaintiff failed to exhaust administrative remedies, are raised by defendants in support of their motion for summary

---

[12]Defendants also conducted at least two investigations into plaintiff's discrimination claims and held multiple meetings with him to address his complaints, so the basis for these claims is not evident to the Court.

United States District Court
For the Northern District of California

judgment.   The arguments plaintiff makes in his summary judgment motion with regard to these affirmative defenses repeat the arguments he makes in opposition to defendants' summary judgment motion.   Thus, the Court DENIES plaintiff's motion for summary judgment on these affirmative defenses for the reasons discussed above. Plaintiff's motion for summary judgment on defendants' other affirmative defenses is DENIED as moot in light of the disposition of defendants' motion.

## CONCLUSION

For the foregoing reasons, the Court GRANTS defendants' motion for summary judgment. (Docket No. 303.)  Plaintiff's motion for summary judgment on defendants' twenty-one affirmative defenses is DENIED as moot. (Docket No. 305.) Finally, defendants' objections to plaintiff's evidence, unless otherwise noted above, are DENIED as moot.  (Docket No. 340.)

**IT IS SO ORDERED.**

Dated:  May 19, 2009

_____
SUSAN ILLSTON
United States District Judge